Pedro **CERVANTEZ** and Juan Lozano, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

Gary **WHITFIELD**, et al., Defendants.

Civ. A. No. 2–79–206.

United States District Court, N.D. Texas, Amarillo Division.

July 22, 1985.

---

**1440**

Edward J. Tuddenham, Texas Rural Legal Aid, Inc., Hereford, Tex., Lee J. Teran, Texas Rural Legal Aid, Inc., San Antonio, Tex., for plaintiffs.

John West and Ann Kraatz, Asst. Atty. Gen., Austin, Tex., for Whitfield, Mathews and Speir.

Jerry Smith, Hereford, Tex., for Travis McPhearson.

Charles White, Plainview, Tex., for Deaf Smith County.

Morris H. Deutsch, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, D.C., and Roger L. McRoberts, Asst. U.S. Atty., Lubbock, Tex., for amicus curiae U.S.A.

## ORDER

MARY LOU ROBINSON, District Judge.

This class action challenging the legality of a variety of practices of the Immigration and Naturalization Service ("INS"), the Texas Department of Public Safety ("DPS"), and the Deaf Smith County Sheriff's Department with regard to suspected immigration law violators is before the Court on the parties' joint motion for approval of the proposed settlements between the plaintiffs and the state and county defendants. A brief sketch of the procedural history of this case is necessary to understand the Court's disposition of the instant motions.

*I. Procedural History of the Litigation*

This action was filed by Pedro Cervantez and Juan Lozano on December 12, 1979, against three groups of defendants: Deaf Smith County and Travis McPhearson, Sheriff of Deaf Smith County (the county defendants); the Director of the Texas Department of Public Safety, DPS Officers Gary Whitfield and Darrell Mathews, and an unknown DPS officer (the state defendants); and the Immigration and Naturalization Service together with border patrol

officer Tom Smiley (the federal defendants).

According to the Original Complaint, Plaintiff Cervantez, a United States Citizen, was arrested by DPS Officer Whitfield and the unknown DPS officer during a routine traffic stop because he was unable to produce either a visa or his birth certificate. Cervantez was transported to the Deaf Smith County jail and held for three days without charges and without any court appearance. On the third day, Cervantez was interrogated by border patrol officer Tom Smiley, who subsequently ordered Cervantez' release.

In an unrelated incident, Plaintiff Lozano, a United States citizen, stopped at the offices of the DPS in Hereford, Deaf Smith County, Texas, to ask directions. DPS Officer Mathews demanded that Lozano produce a birth certificate. When Lozano was unable to do so, Mathews arrested him and held him until his wife arrived two hours later to corroborate his citizenship.

Plaintiffs alleged that the actions of the federal, state and county defendants toward them exemplified the regular practices of those defendants, and deprived them of their rights under the Constitution and laws of the United States. They sought to represent two classes:

(1) all Hispanic persons who have been, are or will be lawfully present in the Amarillo and Lubbock divisions of the Northern District of Texas and who have been, are, or will be subject to the practices of defendant officials of INS and DPS as challenged in the complaint; and (2) all Hispanic persons who have been, are, or will be lawfully present with[in] Deaf Smith County, Texas, and who have been, are, or will be subject to the practices of defendants McPherson and County of Deaf Smith as challenged in the complaint.

In an amended complaint, Plaintiffs also sought injunctive and monetary relief against a defendant class consisting of "Defendant Travis McPhearson, individually and as class representative for all of the sheriffs of Texas counties within DPS District Five." DPS District Five covers the Texas panhandle and extends both south and southeast from the panhandle into the south plains. It comprises 60 counties stretching from Parker County, just west of Fort Worth, north to Montague County on the Oklahoma border, and west to Yoakum County, on the New Mexico border just southwest of Lubbock.

After several years of extensive discovery, plaintiffs and the federal defendants filed a proposed stipulated settlement. The Court approved this settlement in open Court on February 6, 1984. The Federal Stipulation is reprinted in Appendix 1. An agreed Order of Dismissal was entered on March 23, 1984, and the federal defendants ceased to be parties to this action.

In the spring of 1984, on the eve of the class certification hearing, the remaining parties settled. On June 4, 1984, the Court entered an Agreed Order certifying two classes with respect to Plaintiffs' claims against the county defendants. The classes were defined as follows:

"Injunctive Relief Class"

All persons of Hispanic descent who have been or will be questioned, arrested, detained, incarcerated or charged by County Defendants for investigation of their immigration status, or for alleged violations of the immigration laws or whose immigration status or alleged violations of the immigration laws negatively affected their rights to release, bail, visitation, or a hearing otherwise available for a person held on other charges.

"Monetary Relief Class"

All persons of Hispanic descent who have been questioned, arrested, detained, incarcerated or charged by County Defendants for investigation of their immigration status or for alleged violations of the immigration laws, or whose immigration status or alleged violations of the immigration laws negatively affected their rights to release, bail, visitation, or a hearing otherwise available for persons held on other charges.

That same day the Court tentatively approved the "Stipulation for Entry of Judgment and Decree Regarding Claims for Injunctive Relief, Damages, Attorney's Fees, and Costs Against County Defendants", and directed notice to the classes through publication in English and Spanish in newspapers in Hereford and Lubbock, and Spanish language radio broadcasts in Plainview, Hereford, Dimmitt, and Muleshoe. The County Stipulation is reprinted in Appendix 2.

On July 16, 1984, the Court entered an Agreed Order certifying two classes with respect to Plaintiffs' claims against the state defendants. The classes were defined as follows:

"Statewide Class"

The Statewide Class consists of all persons of Hispanic descent who have been or will be questioned, arrested, detained, incarcerated or charged by D.P.S. personnel for alleged violations of the immigration laws or for investigation of the[ir] immigration status.

"D.P.S. Region 5 Class"

The D.P.S. Region 5 Class consists of all persons of Hispanic descent who have been questioned, arrested, detained, incarcerated or charged by D.P.S. personnel in D.P.S. Region 5 for alleged violations of the immigration laws or for investigation of the[ir] immigration status.

That same day the Court tentatively approved the "Stipulation for Settlement", reprinted in Appendix 3. The Court directed notice to the Statewide Class through publication in English and Spanish in major newspapers in Amarillo, Lubbock, Wichita Falls, Dallas, Tyler, Houston, Austin, San Antonio, Brownsville, Laredo, Midland, and El Paso. The Court directed notice to the D.P.S. Region 5 Class through publication in English and Spanish in major newspapers in Amarillo, Lubbock, Plainview, Hereford, Wichita Falls, Perryton, Dimmitt, and Muleshoe, and Spanish language radio broadcasts in those same cities. At the suggestion of the parties, the Court also directed publication of the D.P.S. Region 5 Class notice in major newspapers in each of the following cities in the Republic of Mexico: Ciudad Juarez, Chihuahua, Durango, and Mexico City.

With the exception of the newspaper publication in Mexico, all of the class notices were given as ordered. Because the parties have had great difficulty obtaining the publication of notice in Mexico, the D.P.S. Region 5 Class settlement is not yet ready to be presented to the Court for final approval.

On April 4, 1985, the Court held a hearing concerning final approval of the proposed settlements of the County Injunctive Relief Class, the County Monetary Relief Class, and the Statewide Class.

## II. Legal Standard for Approval of the Proposed Settlements

Rule 23(e) provides that a class action may not be settled without approval of the Court and notice to members of the class. "In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable...." *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977).

> [T]his requires a three-step process. First, the district court must evaluate the likelihood that plaintiffs would prevail at trial. Second, the district court must establish a range of possible recovery that plaintiffs would realize if they prevailed at trial. And third, guided by its findings on plaintiffs' likelihood of prevailing on the merits and such other factors as may be relevant, the district court must establish, in effect, the point on, or if appropriate, below, the range of possible recovery at which a settlement is fair and adequate.

*In re Corrugated Container Antitrust Litigation, (Adams Extract),* 643 F.2d 195, 212 (5th Cir.1981). This procedure is principally directed at monetary settlements, such as that of the County Monetary Relief Class. The Court's role in approving agreed injunctive relief is somewhat different:

In a ... consent decree case, we require the district court to become more involved in the settlement process than it would in an ordinary case. When presented with an ordinary settlement, the court will approve the agreement if it is "fair, adequate and reasonable." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977). In a ... consent decree case, however, even though the decree is contractual in nature, "the court ... must not merely sign on the line provided by the parties." *United States v. City of Miami*, 664 F.2d 435, 440 (5th Cir.1981) (en banc). As Judge Rubin emphasized in *City of Miami*, since a consent decree reaches into the future and has a continuing effect, the district court must bake an active role in its implementation. Even where all the parties agree to a consent decree, the court should

> examine it carefully to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates Constitution, statute or jurisprudence. This requires a determination that the proposal represents a reasonable factual and legal determination based on the facts of the record, whether established by evidence, affidavit or stipulation.

*Id.* at 441.

The district court properly goes through this examination even when the consent decree only affects the parties who drafted the decree. But where, as in this case, the decree has the potential to affect third parties, the court must make an additional finding. When third parties are involved, the court must also carefully scrutinize the decree with respect to their rights and conclude that the effect on the third parties is "neither unreasonable nor proscribed." *Ibid.* *Williams v. City of New Orleans*, 729 F.2d 1554, 1559–60 (5th Cir.1984) (en banc). The Court turns, then, to consideration of the proposed settlements in light of these legal standards for approval.

## III. The County Monetary Relief Class Settlement

■ The County Monetary Relief Class has agreed to settle its claims against the county defendants on the terms set forth in ¶¶ 16–22 of the County Stipulation. No objections were filed to this proposed settlement. Plaintiffs and the county defendants agree that the following persons who filed claims after notice to the class are entitled to recover the indicated sums from the $11,000.00 monetary relief fund established by ¶ 21 of the County Stipulation:

| Name | Days in Jail | Award |
| --- | --- | --- |
| Santiago Lopez | 3 days | $ 660.00 |
| Manuel Cervantez | 2 days | 440.00 |
| Rodrigo Rodriguez | 4 days | 880.00 |
| Mario Palacios | 1 day | 220.00 |
| Jose Franco | 2 days | 440.00 |
| Irene Franco | 2 days | 440.00 |
| Veronica Franco | 2 days | 440.00 |
| Andrea Guardiola | 2 days | 440.00 |
| Abel Guardiola | 2 days | 440.00 |
| Candelario Guardiola | 2 days | 440.00 |
| Silvestre Trevino, Jr. | 2 days | 440.00 |
| Silvestre Trevino, Sr. | 2 days | 440.00 |
| Isidro Ruiz | 3 days | 660.00 |
| Feliciano Luna | 2 days | 440.00 |
| Luis Marquez | 2 days | 440.00 |
| Concepcion Barrientos | 6 days | 1320.00 |
| Jose Barrientos | 2 days | 440.00 |
| Miquel Quinones | 2 days | 440.00 |
| Antonio Brito | 2 days | 440.00 |
| Rosa Maria Martinez-Chabera | 3 days | 660.00 |
| Total | | $11,000.00 |

Applying the three-step process from *Adams Extract*, the Court reaches the following conclusions:

1. Likelihood that plaintiffs would prevail at trial. No party has provided the Court with any evidentiary basis from which it can conclude whether any of the individual claimants would have prevailed at trial. In general, the Court observes that the discovery of record indicates that it is unlikely that any of the plaintiffs would have prevailed against either of the county defendants because of the stringent standards in the Fifth Circuit for recovery against a political subdivision of the state, or a supervisory official, under the Civil Rights Act of 1871.

2. The range of possible recovery. The range of possible monetary damages in civ-

il rights suits is notoriously difficult to estimate. Again, the parties have not provided the Court with any assistance on this question. Based on this Court's past experience with civil rights actions alleging unreasonable seizures under the Fourth Amendment, the range of possible recovery is roughly $200 to $5000, with a slightly higher range for extended incarceration, such as Concepcion Barrientos' six days.

3. Fairness and adequacy of the proposed recoveries. Although the benchmark rate of $220.00/day is near the lower limit of possible recoveries, it is fair and adequate because of the very low probability that any of the claimants would have prevailed against the county defendants. The Court notes a disproportionate award to named Plaintiff, and class representative, Pedro Cervantez: $2,000 for three days incarceration, a daily rate of compensation more than three times that received by any member of the class he is supposed to represent. Nevertheless, none of the class members have filed any objection. Further, the settlement has the unanimous recommendation of counsel, who are presumed to have negotiated in good faith.

The proposed settlement between the County Monetary Relief Class and the county defendants is approved. Counsel are directed to submit an agreed order for entry reflecting this approval.

*IV. The County Injunctive Relief and Statewide Classes Proposed Settlements*

Each of these proposed settlements consists entirely of declaratory and injunctive relief. No question of monetary damages is involved. The responses received after notice to the classes do not object to any particular portion of the proposed settlements and most appear to be from persons who are not members of either class. Virtually all of the few responses are simply social commentary and expressions of outrage over the federal courts, illegal aliens, and Texas Rural Legal Aid (class counsel). No objection to either settlement was filed by any member of either class or any party to the litigation. The Court has permitted the United States to appear as amicus curi-

ae. As amicus curiae, the United States has filed briefs urging the Court to disapprove both proposed settlements. The Court will first address the factors favoring approval, and then the concerns of the United States.

*A. Factors Favoring Approval*

Several factors counsel approval of the proposed settlements. On the question of declaratory and injunctive relief, the plaintiffs have a relatively low probability of prevailing because of the standing issue. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977). Further, the discovery of record indicates significant factual questions concerning the practices and policies of the state and county defendants. It is more likely than not that plaintiffs would not prevail on the questions of fact at a trial of this action. This determination is based on a limited record. (Because the action never proceeded past the class certification state, discovery on the merits never proceeded in earnest. *See* N.D.Tex.Rule 10.2(c).)

The consideration the plaintiffs receive in return for the surrender of their litigation rights is great. Even if they were to prevail at trial, it is unlikely that the Court would order the extensive relief contained in the proposed settlements, particularly in such areas as noncustodial interrogation, *Miranda* warnings, inflexible time deadlines, and communication between law enforcement agencies.

Also of importance is that the proposed settlements have the unanimous recommendation of counsel for the parties, albeit recommendations seemingly grounded more in the hopes of avoiding the cost of continued litigation than in any assessment of the merits or the size of any ultimate recovery. Further, as noted above, no class member or party has filed any objection.

Finally, the risk of continued litigation is substantial for the plaintiffs and the expenses inordinate for all. The class certifi-

cation hearing promised to be hard fought and lengthy. If the plaintiffs lost, they would have to pursue numerous individual actions in several forums. If they prevailed, the immediate future held only extensive discovery on the merits and a lengthy trial.

### B. The Concerns of the United States

The United States argues that two provisions contained in both proposed settlements are contrary to national immigration and law enforcement policy and, therefore, the proposed settlements should be disapproved. In particular, the government argues that "[p]ortions of the Proposed Settlement[s] are contrary to law and public policy, in that they would limit lawful and desirable cooperation between local police and the Immigration and Naturalization Service in the enforcement of the immigration laws and would misinform individuals suspected of violating those laws as to their rights."

The first provision the government objects to is embodied in ¶ 12(b) of the State Stipulation and ¶ 10(b) of the County Stipulation, which provide, respectively, that:

> If an I.N.S. officer requests to speak to a person in D.P.S. custody, D.P.S. Defendants shall inform that person that ... such person has the right to refuse to speak with the I.N.S. officer,

and

> In the event that an INS officer requests to speak to a person in county custody, County Defendants shall inform that person that: ... such person has the right to refuse to speak with the INS officer.

The United States argues that these provisions violate § 287(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1357(a)(1), which provides that any INS officer or employee "shall have power without warrant ... to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States," and that INS officers have the right to at least attempt to interrogate a detained suspected alien. At first blush this appears to be an argument that INS has the right to attempt interrogation even after a detainee

has invoked his right to silence before a county or DPS officer. At oral argument, though, the government clarified its position:

> Now, first of all the plaintiffs mischaracterized INS' position by stating that the INS would like to continue an interrogation in which it has been indicated that the person does not want to be interrogated. I would not stand here and argue for the Immigration Service's ability to do that, and Immigration Service is certainly not seeking to be able to violate someone's Fifth Amendment right against self-incrimination. However, our reading of the provision in both of these agreements is that the common definition of that "you may refuse to speak with someone" can—is likely to and probably will be interpreted by the officers involved, in that it is so unclear as it would be interpreted, to say that the INS officer cannot even go in and see the alien who is being detained on state charges, on independent state charges.... [I]f the person refuses to speak with the INS officer, that is fine, even if he refuses to speak with the INS officer before the officer gets there, but officers are trained to recognize sometimes without even hearing the voice or receiving answers to questions from the detainee, sometimes their experiences are so good at recognizing people that they can say that this person is from Guatemala as opposed to El Salvador and be fairly accurate in doing so.... But the thing we are objecting to is the probability that this language will be interpreted to mean that the INS officer can be refused access to even see this person who is being detained. And the plaintiff mischaracterizes our position by saying that we are referring to anything other than that.

Tr. of Oral Argument at 23–24 (April 4, 1985). Class counsel immediately stated that these provisions are directed only to the question of speaking, not seeing. *Id.* at 28. Counsel for the state defendants concurred. *Id.* at 36–37.

"To speak" does not mean "to be seen," and counsel are in agreement that neither proposed settlement gives a detainee the right not to be seen by an INS officer. Nonetheless, since the proposed settlements are disapproved for other reasons explained below, the need for clarity in these provisions must be noted. The Court will expect any future proposed injunctive settlement embodying these provisions to be clearly worded so as to avoid any possible similar ambiguity as to interpretation.

The second provision objected to by the United States is embodied in ¶ 5(c) of the State Stipulation and ¶ 5(c) of the County Stipulation, which provide, respectively, that:

> [The D.P.S. may notify] I.N.S. of any person D.P.S. has reasonable suspicion to believe, based on specific articulable facts, is in violation of the immigration law; provided that a person's inability to speak English, Hispanic appearance, or admission that s/he has no immigration documents shall not, without more, constitute reasonable suspicion to believe a person is an alien or has violated the immigration law; and provided further that notification be limited to providing the name and location of such person ... and that further contact between I.N.S. and such person be initiated only by I.N. S. . . . .

and

> [County Defendants shall not notify] INS concerning persons who are in county custody and also suspected of being in the United States in violation of civil or misdemeanor criminal immigration laws.

The United States argues that these significant limitations on communication between state and federal law enforcement agencies are contrary to the express public policy of both the United States and the State of Texas, and that "[i]t is obviously not in the public's interest for a court to encourage state law enforcement officials to adopt a policy of non-cooperation with the INS, thwarting that agency's enforcement of the immigration laws." Of course, a consent decree is not merely encourage-ment. It is a statement that this Court will fine and, if necessary, imprison people for violating a specific code of conduct.

In a Press Release of June 23, 1978, Attorney General Griffin Bell reaffirmed that it is the policy of the Department of Justice that state and local police forces should not "stop and question, detain, arrest or place 'an immigration hold' on any persons not suspected of crimes, solely on the grounds that they may be deportable aliens;" but that "[u]pon arresting an individual for a nonimmigration criminal violation [the state or local police should] notify the [INS] immediately if it is suspected that the person may be an undocumented alien so that the Service may respond appropriately."

Similarly, the United States asserts, the public policy of the State of Texas is clearly expressed in Tex.Att'y Gen.Op. No. H–1029 (1977), in which then Attorney General, now Chief Justice, John Hill said:

> A Texas peace officer may make a warrantless arrest of an alien upon probable cause to believe that an illegal entry has occurred in the officer's presence, or, if the requirements of Article 14.03 or 14.-04 of the Code of Criminal Procedure are satisfied, that the suspect has committed a felony offense under the immigration laws. Aliens may be arrested for violation of State criminal laws on the same basis as other persons, and *State officers may notify federal officials when such a person is suspected of being illegally in the United States* and turn the suspect over to federal officials after disposition of State criminal charges. A Texas peace officer may not arrest without warrant an alien solely upon the suspicion that he has entered the country illegally. (Emphasis added.)

The proposed settlements sharply curtail the discretion implied in Attorney General Hill's Opinion. The county defendants agree that they will never report civil and misdemeanor criminal immigration law violators in their custody, even if the detainee openly confesses his or her violations.

The state defendants agree not to report suspected violators to the INS without reasonable suspicion to believe that the detainee is a violator. The United States does not take issue with the reasonable suspicion requirement, but strenuously objects to the State Stipulation's black letter law that inability to speak English, Hispanic appearance, and lack of immigration papers, without more, does not constitute reasonable suspicion. Indeed, the government argues that these three factors, without more, constitute probable cause to detain a person for a deportation hearing. Tr. of Oral Argument at 27 (April 4, 1985).

■ Resolution of this abstract legal question is neither necessary nor appropriate to disposition of the joint motion for approval of the settlement because the proposed settlements far exceed any required degree of adequacy in protecting the class members' interests and are beyond all bounds in the extent to which they would needlessly embroil the Court in the day-to-day operations of the DPS and the Deaf Smith County Sheriff's Department.

The class members have a legitimate interest in protecting themselves from unreasonable seizures under the Fourth Amendment. The specific evils this action is directed to are the indiscriminate use of immigration holds by the INS and the incarceration of suspected aliens without probable cause by the state and county defendants. The class members reason that one of the most efficient ways to limit the indiscriminate use of immigration holds by the INS is to curtail communication between the state and county defendants, and the INS. But the class members do not have any constitutionally protected interest in communications between the INS and state and county law enforcement agencies. This Court cannot and will not approve a proposed settlement such as the County Stipulation, which by its terms would allow known immigration law violators to go unreported, or the State Stipulation, which imposes an abstract requirement of reasonable suspicion before a DPS officer may communicate with the INS about a suspect-

ed alien—to be enforced with fines or imprisonment if violated.

Of course, the degree of cooperation between state and local law enforcement agencies and the INS is a matter committed to the discretion of state and local officials. Those officials are free to adopt policies or regulations identical to those in the County and State Stipulations, but it is not appropriate for this Court to use its contempt power to perpetuate today's policy decisions into the future when they unreasonably impact on the vital public interest in enforcement of the immigration laws, pose an artificial barrier to the INS' attempts to enforce those laws, and are only remotely causally related to the class members' grievances.

Even beyond the reasonable suspicion threshold, the communication barrier is enormous. Paragraph 5(c) allows only the name and location of the suspected alien to be communicated to the INS. The DPS officer cannot tell the INS why he or she suspects an immigration law violation, what charges the suspected violator is being held on, or how long the DPS estimates the suspected violator will remain in custody. Nor can the DPS officer phone back if circumstances change. None of this communication has anything to do with whether an individual is being illegally held and it is senseless to threaten police officers with punishment for simply talking to the INS. An individual who is illegally in custody has adequate tort and habeas corpus remedies without the censorship of speech between police officers and the INS by this Court.

Similar problems pervade both proposed settlements. For example, DPS officers cannot question persons legally in custody on nonimmigration charges about their right to be or remain in the United States, ¶ 4(a), or about even felony criminal immigration law violations without reasonable suspicion, ¶¶ 4(c) & 5(g). The prohibition in ¶ 4(a) persists even if a detainee volunteers that he or she is illegally in this country. Coordinated operations between the INS or the DPS are allowed so long as "DPS De-

fendants do not act as agents or employees of INS." ¶ 5(d). Thus, on pain of contempt, a DPS officer must be able to distinguish between "coordinated activity" and sophisticated concepts of agency.

Under ¶ 6 of the State Stipulation, a DPS officer who had reasonable suspicion based on specific articulable facts that a person had committed a criminal violation of the immigration laws could not question that person if he encountered him at a driver's license checkpoint because the original vehicle stop would not be based on probable cause to believe a crime is being or has been committed. Indeed, ¶ 6 outlaws all *Terry* stops based on reasonable suspicion, but not probable cause, by DPS officers for criminal immigration law violations. Paragraph 6 also prohibits a DPS officer from arresting a person for illegal entry into the United States "unless the illegal entry actually occurs in the officer's presence or view," even if the officer has a warrant for the person's arrest on that charge. Paragraph 6 also restricts all arrests for illegal entry to "officers in counties contiguous with the international border." Thus a DPS officer could not arrest a person for illegal entry if that person landed a plane on a rural airstrip outside a border county, nor could he arrest a person who came ashore in any Gulf Coast county other than Cameron.

Paragraph 7 of the State Stipulation provides an inflexible 24-hour rule between arrest and appearance before a United States Magistrate for criminal immigration law violators, apparently punishable by contempt without regard for any mitigating circumstances.

Counterparts to many of these provisions appear in the County Stipulation and suffer from the same defects. Some, such as the complete ban on communication regarding civil and misdemeanor criminal immigration law violators, are worse.

## C. Conclusion

The Court finds that the effect of the proposed settlements between the plaintiffs and the state and county defendants on nonparties to this litigation is unreason-able. The Court further finds that the parties' proposal that this Court engage in extensive regulation of DPS and county practices that are, at best, only remotely causally related to the harm suffered by the plaintiff classes, is neither a fair nor a reasonable basis on which to settle this litigation. The proposed settlements of the County Injunctive Relief Class and the Statewide Class are disapproved.

## V. Summary & Afterword

1. The County Monetary relief Class settlement is approved. Counsel are directed to submit an agreed order for entry reflecting this approval.

2. The County Injunctive Relief Class and Statewide Class proposed settlements are not approved.

3. Since the Agreed Orders for Class Certification were signed in contemplation of the final settlements being approved, the County Injunctive Relief Class and the Statewide Class are hereby decertified. The Court will set a hearing on class certification at a later date.

The Court does not lightly disapprove these settlements, which are the product of extensive and difficult negotiations. The INS has come to the Court at the eleventh hour to raise its public policy concerns after failing to negotiate a package settlement when it was a party to the action. Although invited to do so, it refused to comment on the proposed state and county settlements until after the parties had incurred expenses of more than $20,000 in providing class notice. If the INS wants to be taken seriously, it must provide the parties with feedback during any future settlement negotiations. Nonetheless, the INS has raised serious public policy questions about the current proposed settlements.

The Court itself has grave reservations about the far-reaching supervision of the DPS the parties apparently desire. While the plaintiffs have legitimate concerns about the illegal questioning and detention of United States citizens, they failed to present a record from which this Court can conclude that this omnibus package of ex-

tensive and invasive remedies represents a reasonable resolution of their grievances.

The parties are directed to provide a copy of this Order to every person who received a copy of the proposed settlements.

It is so ORDERED.

## APPENDIX 1
## STIPULATION

IT IS HEREBY STIPULATED by counsel for the Plaintiffs, Pedro Cervantez, and Juan Lozano, and for the Defendants, the Immigration and Naturalization Service (INS) and the former Border Patrol agent, Tom Smiley, that:

1. This stipulation when final and approved by the Court resolves any and all claims of the Plaintiffs, against Defendants INS and Tom Smiley arising from the arrest and incarceration of the Plaintiffs as recited in the First Amended Complaint.

2. It is the policy of the United States Department of Justice, of which the INS is a component, with respect to enforcement of the immigration laws by state, county, and local law enforcement agencies that state, county, and local law enforcement agencies do not have authority to question, arrest, or detain persons solely on the grounds that they may be deportable aliens. Only INS and its agents have the authority to question, arrest, or authorize the detention of persons for civil violations of the Immigration laws.

3. An "immigration hold" is an authorization made by an immigration officer to a state, county, or other local law enforcement agency which requests the local agency to detain a person for INS for possible future proceedings under the immigration laws. An immigration hold is an arrest without warrant made pursuant to 8 U.S.C. § 1357(a)(2). As such, an immigration hold may only be authorized by an officer of the INS and only when the officer has determined that there is probable cause to believe that the person to be held (a) is an alien, (b) is in the United States in violation of the immigration laws, and (c) is likely to escape before a warrant can be obtained for his arrest.

4. Pursuant to 8 U.S.C. § 1357(a)(2) and in accordance with INS policy, an immigration hold authorized by an immigration officer expires twenty-four (24) hours after the immigration hold takes effect unless within the 24 hours: (a) the person detained is advised of his rights pursuant to 8 C.F.R. § 287.3 and is seen, in person, by an immigration officer and examined to determine whether there is probable cause that the person is deportable or excludable, and (b) either (1) a properly executed Order to Show Cause with notice of available free legal services in the area is served on the detainee or, (2) the detainee voluntarily executes a request to depart voluntarily from the United States. It is INS policy that upon expiration of an immigration hold, the state, county, or local law enforcement agency detaining the person must release from custody any person so held.

5. The Department of Justice urges state, county, and other local law enforcement agencies that, when such agencies have custody of a person who is suspected of being in violation of the immigration laws, or is subject to an immigration hold, any state criminal or traffic charges pending against such person should be processed in the same manner as state criminal or traffic charges pending against persons not suspected of being aliens. Disposition of state criminal or traffic charges should not be delayed solely because a person is suspected of being an alien or is subject to an immigration hold.

6. After the execution of this Stipulation, Defendant INS shall reensure that all of its officers in the Northern Judicial District of Texas are familiar with the policies, procedures, and requirements described in paragraphs 2, 3, 4, and 5 above by distributing copies of this Stipulation to all such officers. Further, INS shall contact each state, county, and local law enforcement agency operating in the territory covered by the Lubbock and Amarillo Stations of the Border Patrol and request that those agencies ensure that each of their officers is informed of the policies, procedures and

requirements stated in paragraph two (2) through five (5) above.

7. The Amarillo and Lubbock Stations of the Border Patrol will maintain records of notification by state, county, or other local law enforcement agencies concerning persons suspected of being in violation of the immigration laws. Such records shall contain the following information: (a) the name of the agency notifying the INS; (b) the name of the suspected alien; (c) the date and time of the notification; (d) the action taken or authorized by INS in response to the notification; (e) the date and time the INS action is taken or authorized; and (f) the initials or name of the officer taking the action. INS will make a good faith effort to determine and record the state or local charges pending against the suspected alien at the time INS action is taken or authorized.

8. The Amarillo and Lubbock Stations of the Border Patrol will create and maintain the records described in paragraph seven (7). Such records will be created for three (3) years from the date this Stipulation is final and approved by the Court. Any records so created will be maintained for three (3) years.

9. Upon the execution of this Stipulation, Plaintiffs shall join Federal Defendants INS and Smiley in a Motion To Suspend Discovery and To Dismiss Federal Defendants INS and Smiley from this lawsuit. Such execution and dismissal shall be without prejudice to Plaintiffs' rights to seek attorneys' fees and costs from INS pursuant to the Equal Access to Justice Act.

## APPENDIX 2

### STIPULATION FOR ENTRY OF JUDGMENT AND DECREE REGARDING CLAIMS FOR INJUNCTIVE RELIEF, DAMAGES, ATTORNEY'S FEES, AND COSTS AGAINST COUNTY DEFENDANTS

This stipulation is entered into by, between, and among Plaintiffs, PEDRO CERVANTEZ and JUAN LOZANO, and the class they represent, and Defendants, DEAF SMITH COUNTY, TRAVIS McPHEARSON, individually, and JOE BROWN, in his official capacity as Sheriff of Deaf Smith County, their agents, assigns, employees, and successors in office (hereinafter referred to as "County Defendants"), through their respective attorneys;

### INJUNCTIVE RELIEF

1. In regard to the injunctive relief claims, Plaintiffs represent a class defined as "All persons of Hispanic descent who have been or will be questioned, detained, incarcerated, or charged by the County Defendants for investigation of their immigration status or for alleged violations of the immigration laws, or whose immigration status or alleged violations of the immigration laws negatively affected their rights to release, bail, visitation, or a hearing otherwise available for persons held on other charges."

2. This stipulation, when approved by the Court, resolves all of Plaintiffs' claims for injunctive relief against County Defendants as recited in Plaintiffs' First Amended Complaint.

3. Definitions:

(a) An "immigration hold" is a request made by Immigration and Naturalization Service (hereinafter referred to as "INS") to a state, county, or local law enforcement official to detain for investigation by INS a person who is in state, county, or local custody. It is an arrest without warrant made pursuant to 8 U.S.C. § 1357(a)(2) and 8 C.F.R. 287.3;

(b) "State charges" as used in this stipulation include:

(1) Charges for violation of state criminal statutes;

(2) Charges for violation of state or local traffic laws;

(3) Arrest pursuant to a state capias or arrest warrant;

(4) Arrest pursuant to a valid federal warrant;

(5) An order of commitment;

(6) A writ of commitment;

(7) Juvenile charges.

4. County Defendants have no authority to arrest persons for illegal entry or illegal presence in the United States or to enforce other United States civil and misdemeanor criminal statutes and regulations regarding immigration and naturalization, either with or without the permission of the INS. County Defendants and their personnel shall cease from engaging in such activities.

5. In furtherance of the policy stated in Paragraph 4, and subject to Paragraph 6 hereof, County Defendants shall not engage in any of the following activities:

(a) Questioning persons, including persons stopped, arrested, or detained on state charges about their nationality, national origin, place of birth, or concerning their right to be or to remain in the United States;

(b) Stopping, detaining, or incarcerating any person for being in violation of civil or misdemeanor criminal immigration laws, or for investigation of such person's place of birth, nationality, national origin, or immigration status for any purpose;

(c) Notifying INS concerning persons who are in county custody and also suspected of being in the United States in violation of civil or misdemeanor criminal immigration laws;

(d) Accepting custody of or incarcerating in county detention facilities persons in the custody of other state or local law enforcement officers if the person so held is held solely on charges of violation of civil or misdemeanor criminal immigration laws, unless there is proof that the person is being held pursuant to a valid, federal warrant; and

(e) Authorizing, accepting, placing, or facilitating the placement of "immigration holds", as defined above, for any purpose on persons suspected of violation of civil or misdemeanor criminal violations of the immigration laws.

6. Notwithstanding the provisions of Paragraphs 4 and 5 above, nothing in this stipulation shall be construed to prevent County Defendants from:

(a) holding federal prisoners or detainees who are brought to the county jail by federal officers, including INS officers, for detention on behalf of the United States;

(b) arresting or incarcerating a person pursuant to a valid federal warrant or on state charges as defined in Paragraph 3(b) hereof;

(c) Arresting or incarcerating a person without a warrant for felony criminal violations of the immigration laws when there is probable cause to believe that such felonious conduct has occurred and if there is likelihood of the person escaping before a warrant can be obtained for his arrest;

(d) Notifying INS or other federal agencies concerning persons arrested or incarcerated for felony criminal violations of the immigration laws, or accepting immigration holds on such persons, as defined in Paragraph 3(a) above, from INS or other federal agencies. However, any persons so arrested shall be processed as set out in Paragraph 9 hereof.

(e) Questioning a person regarding his place of birth for purposes of filling out a jail booking record;

(f) Responding to requests for assistance from INS, provided that the purpose of such assistance is not to enforce civil or misdemeanor criminal immigration laws, and, provided, that County Defendants do not act as agents or employees of INS, and that County Defendants conduct only activities for which they have authority under state, civil, or criminal statutes.

7. The power to arrest or detain persons for felony criminal violations of the immigration laws, described in Paragraph 6(c) above, shall not be construed to permit arrest or detention of a person for illegal entry or illegal presence in the United States, nor shall it be construed to permit officers to question a person concerning his nationality, national origin, place of birth, or concerning his right to be or remain in the United States, except where the officer has a reasonable suspicion, based on specif-

ic articulable facts that the person has committed a felonious violation of the immigration laws. In this regard, a person's inability to speak English, Hispanic appearance, and admission that he does not possess immigration documents shall not, without more, constitute reasonable suspicion to believe that a person is an alien or that he is committing a felony violation of the immigration laws. Questioning under this provision regarding immigration status may proceed only after *Miranda* warnings have been given to the person suspected of a felony immigration violation.

8. When a person in county custody is suspected of being in violation of the immigration laws, any state charges pending against such person shall be processed in the same manner as state charges against persons not suspected of immigration violations, and such person shall be treated equally with respect to all conditions of confinement accorded persons in county custody. Disposition of state charges and the accordance of rights and privileges of visitation, telephone use, access to counsel, posting of bail bonds, and access to the courts shall not be delayed nor denied because the person is suspected of being in violation of the immigration laws.

9. If a person is arrested without a warrant by state or local law enforcement agencies for felony criminal violations of the immigration laws, County Defendants shall, at the time of booking the person into jail, notify the appropriate federal authorities by teletype of the felony criminal violation of the immigration laws. A copy of the teletype message shall be made part of that person's jail booking record. If the federal authorities do not take custody of the person within 24 hours from the time he is placed in county custody, County Defendants shall no longer detain the person on the felony immigration charges.

10. County Defendants shall not compel, coerce, or encourage any person stopped, arrested, or detained by a county officer or incarcerated in the Deaf Smith County jail to speak to an INS officer, and shall refrain from utilizing INS officers as interpreters or translators. In the event that an INS officer requests to speak to a person in county custody, County Defendants shall inform that person that: (a) an INS officer is requesting to speak with him or her; and, (b) such person has the right to refuse to speak with the INS officer. This information may be provided either orally or by showing the person a written statement of this information. Notwithstanding the foregoing provisions, this paragraph shall not prohibit the use of INS officers as interpretors or translators for persons placed in custody of County Defendants by INS or other federal officers, nor shall it require County Defendants to provide the warning set forth above to persons who have been placed in custody of County Defendants by INS or other federal officers.

11. County Defendants shall post in the Deaf Smith County Jail, in all areas accessible to detainees of the jail, copies of Attachment A, which shall set forth the provisions of Paragraphs 8 and 10.

12. County Defendants shall make available to Plaintiffs' attorneys, upon reasonable request, and within thirty (30) days of such request, for a period of three (3) years after the entry of the Consent Decree, copies of all official directives, memoranda, and manual changes issued by the County Sheriff or received from other governmental law enforcement agencies which concern county enforcement of the immigration laws, cooperation with INS, or immigration law enforcement activities discussed, planned, or conducted by county personnel.

13. County Defendants shall keep records of all persons arrested or detained by County Defendants for felony immigration violations or concerning whom County Defendants notify INS. Existing record keeping practices shall suffice as long as those records include the following information:

(a) The name of the person suspected of violating the immigration laws;

(b) The name and agency of the arresting officer;

(c) All charges on which the person was detained;

(d) The date and time of arrest and/or incarceration;

(e) Statement of the facts supporting probable cause for the arrest if the arrest was made by County Defendants;

(f) The date and time any notification to federal authorities is made and the name of the person or agency notified; and

(g) The disposition of the person or charges (e.g. released to U.S. Marshal; federal charges dismissed, fine paid on state charges) and the date and time of such disposition.

The above-described records shall be made available to counsel for Plaintiffs upon reasonable request, and within thirty (30) days after such request, for a period of three (3) years after the entry of this Consent Decree.

14. County Defendants shall issue to all county deputies and jail personnel copies of Attachment B with proof of service to be endorsed by each such county officer upon receipt. County Defendants shall also hold informational conferences for all present and future county deputies and jail personnel in which the terms of Attachment B shall be fully explained.

15. In the event of changes in Federal or State statutory or case law which affects the terms of this agreement, the parties may petition the Court to amend this stipulation and any injunction issued pursuant thereto. Such petition shall be served on opposing counsel prior to filing with the Court. The parties shall act in conformance with this stipulation and any injunction issued pursuant thereto until a ruling is received on the petition to modify. However, if subsequent changes in statutory law should require conduct on the part of County Defendants which is inconsistent with this stipulation and any injunction issued pursuant thereto, and which requires immediate action by County Defendants, County Defendants may act in conformity with such statutory provisions, provided that within thirty (30) days thereof, County Defendants petition the Court to modify this stipulation and any injunction issued pursuant thereto, and in such circumstances, County Defendants may continue to act in conformity with such statutory provisions until a ruling shall be received from the Court on the petition to modify.

## MONETARY RELIEF

16. In regard to claims for monetary relief against County Defendants, Plaintiffs represent a class defined as "All persons of Hispanic descent who have been questioned, detained, incarcerated, or charged by County Defendants for investigation of their immigration status or for alleged violations of the immigration laws, or whose immigration status or alleged violations of the immigration laws negatively affected their rights to release, bail, visitation, or a hearing otherwise available for persons held on other charges."

17. This stipulation, when approved by the Court, resolves all monetary claims of the named Plaintiffs and of the members of the class described in Paragraph 16 hereof against County Defendants, as set forth in Plaintiffs' First Amended Complaint.

18. Plaintiff, PEDRO CERVANTEZ, shall recover from the following Defendants, the following amounts:

| | |
|---|---|
| (a) Deaf Smith County, Texas: | $1,500.00 |
| (b) Travis McPhearson: | 500.00 |

19. County Defendants shall pay the sum of not more than $500.00 for each day of incarceration in the Deaf Smith County Jail, to each member of the class defined in Paragraph 16, who establishes that:

(a) He or she is a member of the monetary relief class defined in Paragraph 16 hereof; and

(b) His or her claim is not barred by limitations; and

(c) Establishes his or her claim in accordance with Paragraph 22 hereof.

However, persons meeting the definition of class membership as defined in Para-

graph 16 herein who were charged with and convicted of a criminal offense carrying a permissible punishment of one year or more in a county jail or the Texas Department of Corrections which arises out of the incident for which they seek a monetary reward, will receive a monetary award only if they can show that their immigration status or alleged violation of the immigration laws negatively affected their right to release, bail, telephone privileges, visitation, or a hearing otherwise available for alleged violations of state criminal or traffic laws.

20. For the purpose of establishing claims that are not barred by limitations, all claims arising out of incidents occurring on or after December 12, 1977, will be considered to be timely. All claims arising out of incidents arising prior to that date are barred by limitations, unless limitations were told as a result of minority or other disability.

21. The total monetary award for the monetary relief class shall not exceed the total sum of $11,000.00, and in the event that claims exceeding the total sum of $11,000.00 are approved as hereinafter provided, the total sum of $11,000.00 shall be apportioned among the claimants on a ratio for which each respective claim bears to the total sum of all approved claims. The amount for which County Defendants shall be obligated to pay toward the total sum of $11,000.00 shall be allocated as follows:

| | |
|---|---|
| (a) Travis McPhearson: | $2,750.00 |
| (b) Deaf Smith County, Texas: | 8,250.00. |

The first $2,750.00 required to be paid for the claims set out above shall be paid by TRAVIS McPHEARSON, and any additional claims approved for the class, not to exceed an additional $8,250.00, shall be paid by Deaf Smith County, Texas. Notwithstanding the foregoing in the event that the total approved claims do not amount to the total sum of $11,000.00, there shall be no obligation to pay the monetary relief to the class in excess of the amount of the claims actually approved.

22. The following provisions shall apply for the purposes of the submission and approval of claims for monetary relief on behalf of the class members:

(a) Any claim for monetary relief shall be submitted to counsel for County Defendants within ninety (90) days from the date of the Court's notice to class members of this stipulation for settlement.

(b) All claims presented to County Defendants' counsel shall automatically be deemed to be approved for payment, unless within thirty (30) days after receipt of such claim, County Defendants submit an objection to such claim to Plaintiffs' counsel, in writing, setting out the specific basis, grounds, and reasons why such claims should not be approved. For any opposed claim, the counsel for both parties shall have thirty (30) days thereafter in which to attempt to resolve any such disputed claim; and, if not resolved by such time, the dispute shall be submitted for determination by the Court or by any Magistrate appointed by the Court for such purpose.

(c) All claims which are submitted shall be signed and sworn to and shall set forth the identity of the claimant and the basis for the claim. Further, where documentary evidence is available for supporting such claim, copies of such documents shall be attached to the claim.

## ATTORNEY'S FEES

23. Upon approval of this stipulation by the Court, County Defendants shall pay to Plaintiffs' attorneys, attorney's fees in the total sum of $17,000.00, to be allocated as follows:

| | |
|---|---|
| (a) Deaf Smith County, Texas: | $12,750.00 |
| (b) Travis McPhearson: | 4,250.00. |

## COSTS AND EXPENSES

24. Upon approval of this stipulation by the Court, and in addition to the amount set

out above, County Defendants shall pay to Plaintiffs' attorney's costs and expenses, the total sum of $2,700.00, to be allocated as follows:

(a) Deaf Smith County, Texas: $2,025.00
(b) Travis McPhearson: 675.00.

County Defendants shall not be liable for costs and expenses exceeding the amount set out above.

25. In effecting this settlement, the undersigned attorney for TRAVIS McPHEARSON represents that he has received authority, on behalf of the insurance carrier for TRAVIS McPHEARSON, to pay the total sum of $7,500.00, plus the costs to be apportioned to TRAVIS McPHEARSON as set out in Paragraph 24 above, and that he is authorized to enter into this stipulation and agreement and bind the insurance carrier, *Law Enforcement Insurance Co., Ltd. (LEICL)*, in connection with the amounts to be paid by or on behalf of TRAVIS McPHEARSON. It is represented and agreed that the $7,500.00, plus the $675.00 to be paid by and on behalf of TRAVIS McPHEARSON, shall be unconditionally paid toward this settlement, and in the event that the class claims for monetary damages do not equal at least $2,750.00, that portion of the $2,750.00 for which claims are not approved shall be applied by TRAVIS McPHEARSON toward the obligations to be paid by Deaf Smith County, Texas, in connection with this settlement.

24. The making of this stipulation shall in no way constitute an admission on the part of County Defendants that grounds exist for the injunctive relief or monetary relief in this lawsuit, or that Plaintiffs are entitled to recover attorney's fees or costs. This stipulation is entered into solely for the purpose of settlement.

DATED: April 13, 1984.

APPENDIX 3

STIPULATION FOR ENTRY OF CONSENT DECREE REGARDING D.P.S. DEFENDANTS

IT IS HEREBY STIPULATED between Plaintiffs, PEDRO CERVANTEZ and JUAN LOZANO and the class they represent, and Defendants GARY WHITFILL, DARRELL MATTHEWS, WILSON SPEIR and JAMES ADAMS, their agents, assigns, employees and successors in office, (hereinafter referred to as D.P.S. Defendants), through their respective attorneys, that:

1. Plaintiffs represent two classes, defined as follows:

a) "Statewide Class"

The statewide class consists of all persons of hispanic descent who have been or will be questioned, arrested, detained, incarcerated or charged by D.P.S. personnel for alleged violations of the immigration laws or for investigation of their immigration status.

b) "D.P.S. Region 5 Class"

The D.P.S. Region 5 Class consists of all persons of hispanic descent who have been questioned, arrested, detained, incarcerated or charged by D.P.S. personnel in D.P.S. Region 5 for alleged violations of the immigration laws or for investigation of their immigration status.

2. This Stipulation, when final and approved by the Court, resolves all claims, as set forth in Plaintiff's Amended Complaint, of the named Plaintiffs and of the members of the above described classes against all D.P.S. Defendants.

*Statewide Agreement*

3. D.P.S. has no authority to arrest persons for illegal or unauthorized presence in the United States or any other civil provision of the United States immigration laws. D.P.S. shall not enforce federal civil statutes and regulations regarding immigration and naturalization, either with or without the permission of the Immigration and Naturalization Service (hereinafter I.N.S.).

4. In furtherance of the policy stated in paragraph 3, D.P.S. shall not engage in any of the following activities.

a) Questioning any persons, including persons stopped, arrested, or detained on state traffic or criminal charges, about their right to be in or to remain in the United States; and

b) Questioning any persons, including persons stopped, arrested or detained on state traffic or criminal charges, about their nationality, national origin or place of birth for the purpose of enforcing the immigration laws; and

c) Stopping, arresting or incarcerating persons for investigation of their nationality, immigration status, right to be in or to remain in the United States, or for alleged violations of other civil immigration laws or criminal immigration laws for which arrest is not authorized under state and federal law; and

d) Authorizing, accepting, placing or facilitating the placement of "immigration holds", as defined in paragraph 8 below, on persons suspected of violations of the immigration laws.

5. Nothing in paragraphs 3 or 4 shall prohibit D.P.S. from:

a) Arresting or detaining a person pursuant to a facially valid federal warrant for arrest for violation of the immigration laws;

b) Arresting or detaining a person without a warrant for criminal violations of the immigration laws to the extent such arrests are authorized under state and federal law;

c) Notifying I.N.S. of any person D.P.S. has reasonable suspicion to believe, based on specific articulable facts, is in violation of the immigration law; provided that a person's inability to speak English, Hispanic appearance, or admission that s/he has no immigration documents shall not, without more, constitute reasonable suspicion to believe a person is an alien or has violated the immigration laws; and provided further that notification be limited to providing the name and location of such person, that a record be kept pursuant to the provisions of paragraph 13 below, and that further contact between I.N.S. and such person be initiated only by I.N.S. It shall not be mandatory that D.P.S. personnel make such notification, but if such notification is made it shall comply with the provisions of this paragraph.

d) Coordinating D.P.S. operations with I.N.S., provided that during such operations D.P.S. Defendants do not act as agents or employees of I.N.S., and D.P.S. conducts only activities for which it has authority under state civil or criminal statutes or under federal criminal or non-immigration civil statutes.

e) Obtaining information, including place of birth and national origin, required for fingerprint cards, or under the following specific statutes, provided that obtaining the information is not for the purpose of determining the person's right to be in or to remain in the United States:

1) TEX.STAT.ANN. Art. 4413(9)(2);
2) TEX.STAT.ANN. Art. 4413(29c);
3) TEX.STAT.ANN. Art. 6687b;
4) TEX.STAT.ANN. Art. 6675a–6e;
5) TEX.STAT.ANN. Art. 6701h.

f) Questioning a person eligible for release from custody based on a promise to appear in court at the date and time directed by the arresting officer, with regard to the person's temporary address, permanent address, or place of work; provided that such questioning is not for the purpose of determining the person's right to be in or to remain in the United States.

g) Questioning a person about a suspected criminal violation of a law, when there is reasonable suspicion to believe, based upon specific articulable facts, that such person has committed a criminal violation of that law enforceable by D.P.S.

6. The power to arrest, question or detain persons without a warrant for certain criminal violations of the immigration laws as set forth above, shall not be construed to permit arrest or detention of a person for illegal presence in the United States, nor shall it be construed to permit officers to question a person concerning his nationality, national origin, place of birth, or concerning his right to be or to remain in the United States except where the officer has reasonable suspicion to believe based on specific articulable facts, that the person

has committed a criminal violation of the immigration laws enforceable by D.P.S. as set forth above. In this regard, a person's inability to speak English, Hispanic appearance, or admission that he has no immigration documents shall not, without more, constitute reasonable suspicion to believe a person is an alien or that he has committed a violation of the immigration laws. Questioning under this provision regarding immigration status may proceed only after *Miranda* warnings have been given to the person suspected of a criminal violation of the immigration laws. Any non-voluntary detention, including a vehicle stop, prior to such questioning must be based upon probable cause to believe a crime is being or has been committed. In addition, the power to arrest and detain persons for certain criminal violations of the immigration laws does not allow D.P.S. officers to arrest a person for illegal entry into the United States unless the illegal entry actually occurs in the officer's presence or view. Thus, only officers in counties contiguous with the international border would now have occasion to made an arrest for illegal entry into the country.

7. If a D.P.S. officer arrests a person for a criminal violation of the immigration laws as permitted by paragraph 5(b) above, that officer shall be responsible for promptly contacting the appropriate federal authorities, and for assuring that the person arrested is taken without unnecessary delay, and in any case not more than 24 hours after arrest, before the nearest U.S. Magistrate or other available officer empowered to commit persons charged with offenses against the laws of the United States. In addition, any officer making such a criminal arrest under the immigration laws shall be responsible for keeping records of that incident as set forth in the paragraph 13 below.

8. An "immigration hold" is an arrest without warrant made pursuant to 8 U.S.C. § 1357(a)(2) and 8 C.F.R. 287.3. An "immigration hold" may only be authorized by an officer of the I.N.S. and only when the I.N.S. officer has determined that there is probable cause to believe that the person to be held (a) is an alien, (b) is in the United States in violation of the immigration laws, and (c) is likely to escape before a warrant can be obtained for his arrest.

9. Whether or not a person whom an immigration hold has been placed is subject to custody on state traffic or criminal charges, an "immigration hold" automatically expires 24 hours after it has been authorized, unless within 24 hours: (a) the person detained is advised of his rights pursuant to 8 C.F.R. 287.3 and is seen, in person, by an immigration officer and examined to determine whether there is probable cause that the person is deportable or excludable, and (b) either (1) a properly executed Order to Show Cause with notice of available free legal service in the area is served on the detainee or, (2) the detainee voluntarily executes a request to depart voluntarily from the United States.

10. D.P.S. will inform, by written memorandum, all sheriffs in D.P.S. Region 5 that D.P.S. does not place or enforce "immigration holds", the D.P.S. policy is that "immigration holds" should not affect the enforcement of state traffic or criminal laws, and that D.P.S. will not place "immigration holds" on suspected aliens. D.P.S. will send to each sheriff a copy of the memorandum attached to this agreement as Attachment B.

11. When a person in D.P.S. custody (on a criminal charge or pursuant to a facially valid warrant) is suspected of being or charged with being in violation of the immigration laws, is subject to an "immigration hold", or was subject to a hold which has expired, any criminal or traffic charges pending against such person shall be processed by D.P.S. in the same manner as criminal and traffic charges against persons not suspected of immigration violations. Disposition of criminal and traffic charges shall not be delayed nor shall a person be treated differently by D.P.S. with respect to visitation, bonding, attorney access, or other rights or privileges accorded to persons in D.P.S. custody because the person is suspected of being in violation of

the immigration laws or is subject to an "immigration hold."

12. D.P.S. shall not compel, coerce or encourage any person stopped, arrested, or detained by D.P.S. to speak to an I.N.S. officer. If an I.N.S. officer requests to speak to a person in D.P.S. custody, D.P.S. Defendants shall inform that person that (a) an I.N.S. officer is requesting to speak with him or her, and (b) such person has the right to refuse to speak with the I.N.S. officer. This information may be provided either orally or by showing the person a written statement of this information in Spanish.

13. D.P.S. shall record the following information with respect to any person who is (a) suspected of violation of immigration laws and about whom D.P.S. has notified I.N.S., or (b) arrested by a D.P.S. officer for a criminal violation of immigration laws:

a) The name of the person suspected of violating the immigration laws;

b) The name and agency of the arresting officer;

c) Each traffic or criminal charge on which the person was arrested and/or detained;

d) If D.P.S. charged the person with a criminal violation of the immigration laws, a statement of the specific articulable facts which form the basis for probable cause to bring the criminal immigration charge;

e) The date and time of arrest;

f) The date and time any notification to I.N.S. is made;

g) The name of the officer to whom notification is made;

h) The disposition of each charge against the person.

14. D.P.S. shall maintain the documents described in paragraph 13 above for a period of three years, and shall make such documents available to Plaintiffs' attorneys on a quarterly basis for a period of 3 years after the entry of this consent decree. In addition, D.P.S. shall make available to Plaintiffs' attorneys copies of all directives, manual changes, training materials, and other documents disseminated to field personnel issued three years after the entry of this consent decree which concerns D.P.S. enforcement of immigration laws, cooperation with I.N.S., or immigration law enforcement activities discussed, planned, or conducted by D.P.S. personnel.

15. D.P.S. shall issue to all D.P.S. troopers in the State of Texas copies of Attachment A, with proof of service to be endorsed by each trooper upon receipt. D.P.S. shall also hold informational conferences for all present and future troopers, in which the terms of Attachment A shall be fully explained.

16. In the event of change in state or federal statutory law regarding the enforcement of immigration laws by state and local officers, D.P.S. may modify this consent decree to conform to such state or federal statutory law by notifying this Court and Plaintiffs' attorneys of the proposed modifications and the reasons therefore. The change shall become effective forty-five (45) days after such notification unless otherwise ordered by the Court on the Court's own motion or on the motion of the Plaintiffs. In the event any party seeks to modify this consent decree because of changes in case law, it may only be done by order of the Court pursuant to a petition to modify filed with the Court with prior notice to the opposing parties. The modification will not become effective unless the Court so orders.

### Named Plaintiffs

17. D.P.S. Defendants shall pay Plaintiff CERVANTEZ the sum of eight thousand dollars ($8,000.00) as damages, and to Plaintiff LOZANO the sum of two thousand dollars ($2,000.00) as damages.

### D.P.S. Region 5 Class

18. D.P.S. Defendants shall pay the sum of not more than $1,000.00 to each member of the D.P.S. Region 5 class who establishes that a) he or she is a member of the D.P.S. Region 5 class, and b) his or her claim is not barred by limitations. However, class members a) who were only questioned regarding their immigration status, or b) who were charged with and convicted of a felony arising out of the

incident for which they seek a monetary award will receive a monetary award only if they can show that their immigration status or alleged violation of the immigration laws negatively affected their right to release, bail, or a hearing as otherwise available for alleged violations of State criminal or traffic laws.

19. For purposes of establishing that claims are not barred by limitations, all claims arising out of incidents occurring on or after December 12, 1977 will be considered to be timely. All claims arising out of incidents arising prior to that date are barred by limitations unless limitations was tolled as a result of minority or other disability.

20. The total monetary award for D.P.S. Region 5 class members pursuant to paragraph 18 shall not exceed $40,000.00. If more than 40 class members establish claims, the $40,000.00 shall be divided among all approved claimants in equal shares.

*Attorneys Fees*

This agreement does not settle this issue of costs and attorneys fees.

*Other Terms*

22. Upon final approval of this settlement by the Court, the D.P.S. Defendants shall pay all sums set forth herein to Plaintiffs, and D.P.S. Region 5 class claimants. This action shall then be dismissed against D.P.S. Defendants WHITFILL, MATTHEWS, SPEIR and ADAMS with prejudice.

23. This settlement agreement does not constitute an admission of liability by D.P.S. or by D.P.S. Defendants.